**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**LOUISVILLE DIVISION**
**CIVIL ACTION NO.  3:23-CV-00602-RGJ-CHL**

**ANDREW SHAPIRA, et al.,**                                                                         **Plaintiffs,**

**v.**

**RARE CHARACTER WHISKEY CO., LLC, et al.,**                                            **Defendants.**

**MEMORANDUM OPINION AND ORDER**

Before the Court is the Motion to Compel Defendants to Produce Documents Responsive to First Set of Requests filed by Plaintiffs Andrew Shapira ("Shapira"), 7th Heaven, LLC ("7th Heaven"), and Fortuna Bourbon Company, LLC ("FBC").  (DN 32.)  Defendant Rare Character Whiskey Co., LLC ("Rare Character") has filed a response (DN 35) and Plaintiffs have filed a reply.  (DN 36.)  Accordingly, this Motion is ripe for review.  For the following reasons, Plaintiffs' Motion is **GRANTED in part**.

**I.      Background**

      **A.      Factual Background**

            **1.      Shapira, Moix, and Nevenglosky form Fortuna Bourbon**

Shapira's history in investment banking and the distilled spirits industry has provided him with valuable insight, experience, and connections with many prominent contacts within the distilled spirits industry.  (DN 1-1, at PageID # 108, ¶ 14.)  In late 2019, Pablo Moix ("Moix") grew interested in starting a business around his passion and knowledge of American whiskey, and so he reached out to Shapira for his insight.  (*Id.* at PageID # 109, ¶ 16.)  The two developed a deep business relationship, with Shapira providing both insight into the business and connections

to other industry experts. (*Id*.) Around August of 2020, Moix and Peter Nevenglosky ("Nevenglosky") formed Rare Character with George Ruan ("Ruan"). (*Id*. at PageID # 109, ¶ 18.)

The members of Rare Character decided to partner with Shapira, combining Moix's experience as an elite restauranteur, Nevenglosky's experience developing premium niche spirit brands, and Shapira's connections, reputation, and experience in the distilled spirits industry. (DN 1-1, at PageID # 109-10, ¶ 19.) The three were interested in revitalizing a historic brand of whiskey known as Fortuna Bourbon Whiskey, a brand that debuted in the late 19th Century and ceased production in the 1960s. (*Id*. at PageID # 110, ¶ 20.) In pursuing this mission, Rare Character formed a new LLC with Shapira known as Fortuna Bourbon, LLC ("Fortuna Bourbon"). (*Id*. at PageID # 110-13, ¶¶ 21-27.) Shapira created 7th Heaven to serve as the entity through which he would participate in Fortuna Bourbon. (*Id*. at PageID # 114, ¶ 32.) Shapira organized FBC, a separate entity from Fortuna Bourbon, as the entity through which he would source barrels for Fortuna Bourbon. (*Id*. at PageID # 114-15, ¶¶ 34, 35.)

FBC entered into a Confidential Whiskey Supply Agreement ("Supply Agreement") with a distiller to purchase rye-based bourbon whiskey to be used under the Fortuna label and trademark or for other similar projects with Rare Character. (DN 1-1, at PageID # 114-15, ¶ 35.) Under the Supply Agreement, FBC could procure the barrels under specific terms and conditions. (*Id*.) One of these terms was that if, for any reason, Shapira was no longer involved in or no longer benefited from the sale, then the supplier could terminate the contract at any time. (*Id*. at PageID # 115, ¶ 36.) The supplier also retained the right to repurchase the barrels in the event they were not utilized as contemplated under the Supply Agreement. (*Id*.) The supplier also agreed to sell FBC an additional 605 barrels of Kentucky straight malt whiskey under the same terms and conditions of the Supply Agreement, but the supplier permitted FBC to use those barrels under labels other than

the Fortuna label and trademark, including use in the "Rare Character Exceptional Cask Series" offering. (*Id*. at PageID # 115, ¶ 37.)

The members of Fortuna Bourbon agreed that the Fortuna label should reflect Fortuna's historic roots as a Kentucky straight bourbon whiskey. (DN 1-1, at PageID # 115, ¶ 39.) Accordingly, the members agreed that the label should indicate that the bourbon was distilled and bottled *in Kentucky*. (*Id*. at PageID # 116, ¶ 40.) The Parties discussed creating an operating agreement for Fortuna Bourbon, but it was never finished. (*Id.* at PageID # 116-17, ¶ 43.) Nevertheless, the Parties agreed on the material terms. (*Id*. at PageID # 117, ¶ 45.) The material terms included a promise that Rare Character would compensate Shapira for his efforts in benefitting Rare Character. (*Id.*) Accordingly, Shapira continued to procure barrels at significantly reduced prices, negotiate contracts with distributors, launch new markets with distributors, and introduce Rare Character's products to several retailers. (*Id*. at PageID # 117, ¶ 46.)

> **2. The relationship between Rare Character and Shapira begins to deteriorate.**

In late 2022, Shapira saw that the venture was running low on available barrels to sell to start the following calendar year, so he provided a $1 million short-term line of credit in December of 2022 to take advantage of barrels that he also sourced. (DN 1-1, at PageID # 117-18, ¶ 47.) These additional barrels were not sourced under the existing Supply Agreement. (*Id*.) Shapira intended for 200 of these barrels to be used for Rare Character's Single Barrel Series Straight Rye Whiskey finished in amburana casks. (*Id*. at PageID # 118, ¶ 48.)

One of the new suppliers that Shapira had procured for Rare Character was MGP. (DN 1-1, at PageID # 119, ¶ 52.) MGP sold FBC 100 barrels and offered an additional 100. (*Id*. at PageID # 119, ¶ 53.) Moix and Nevenglosky assured Shapira that Rare Character had the funds to purchase

3

the additional barrels, but Rare Character was ultimately unable to pay. (*Id*. at PageID # 119-20, ¶¶ 53-55.) So Shapira began working to secure additional financing agreements and attempted to access Rare Character's financial information to procure those agreements. (*Id*. at PageID # 120, ¶ 55.) However, Shapira could not access Rare Character's financial documents and instead chose to fund the purchase of the additional barrels with a personal loan. (*Id*. at PageID # 121, ¶ 58.) Shapira then provided funding to Rare Character through his entity, 7th Heaven, as a loan ("Revolving Credit Agreement"). (*Id*.)

Shapira began to secure funding from potential lenders before the March 15, 2023, deadline to purchase more barrels. (DN 1-1, at PageID # 121-22, ¶¶ 59-60.) One lender told Shapira that it would need short-term personal guarantees from every member of Rare Character, including Ruan. (*Id*.) Moix told Shapira he would consider the lenders and discuss them with Ruan, but ultimately Shapira never secured the loan. (*Id*.) Rare Character had also never provided Shapira with the financial information he requested in securing new loans for Rare Character. (*Id*. at PageID # 122, ¶ 61.) By March of 2023, Shapira discovered that the members of Rare Character were attempting to raise the funds via a loan from Ruan's parents. (*Id*. at PageID # 124, ¶ 68.) Shapira was concerned by this because the Revolving Credit Agreement between Shapira and Rare Character prohibited Rare Character from incurring any additional debt unless it was to repay the loan. (*Id*. at PageID # 124, ¶ 69.) Shapira grew increasingly worried that Rare Character would not be able to pay its debt to him, and that Rare Character would be unable to pay its suppliers, bottlers, and other business partners. (*Id*. at PageID # 124-25, ¶¶ 70-71.)

On March 5, 2023, Shapira asked Nevenglosky how Rare Character was tracking barrels purchased by Rare Character's buyers, so Nevenglosky provided Shapira with tracking lists. (DN 1-1, at PageID # 125-25, ¶¶ 73-74.) After reviewing the list, Shapira identified several barrels that

4

were not listed on the tracking data. (*Id*. at PageID # 125, ¶ 74.) Shapira had also learned that Rare Character was $45,000 behind on invoices with its bottler, Bluegrass Bottling ("Bluegrass"), and that Bluegrass would not proceed with bottling until the past-due payments were made. (*Id*. at PageID # 132, ¶ 96.) Rare Character made the payments, and Bluegrass began bottling during the middle of March of 2023. (*Id*.)

Sometime between March 12, 2023, and April 4, 2023, Nevenglosky and Moix had allegedly told their operations manager that Fortuna Bourbon was no longer operating due to their deteriorating relationship with Shapira. (DN 1-1, at PageID # 132-33, ¶ 97.) Moix told Shapira that he would purchase barrels through Shapira's sources without his assistance. (*Id.* at PageID # 133, ¶ 98.) Accordingly, Shapira warned Moix and Nevenglosky that, under the Supply Agreement, the supplier had the right to terminate the agreement if Shapira was not involved. (*Id*. at PageID # 133, ¶ 101.)

On or about July 25, 2023, Shapira had also discovered that some barrels sourced under the Supply Agreement had been shipped to Cardinal Spirits, LLC in Indiana. (DN 1-1, at PageID # 138-39, ¶ 126.) Some of those barrels were meant to be used under the Fortuna label, but as they were shipped to Indiana, they could no longer be sold under the Fortuna label because they were no longer distilled and bottled in Kentucky. (*Id*. at PageID # 139, ¶ 127.) As they could no longer be sold under the Fortuna label, they lost some of their value. (*Id*.) Accordingly, Shapira sued Rare Character, its members, and some of its business partners for breach of contract, unjust enrichment, fraudulent misrepresentation, breach of fiduciary duty, and aiding and abetting breach of fiduciary duty.

    **B.**    **Procedural History**

Shapira originally brought this suit in Jefferson Circuit Court. (DN 1, at PageID # 1, ¶ 1.) However, Defendants removed this action to this Court on October 25, 2023, after the Jefferson Circuit Court dismissed the last remaining non-diverse party. (*Id*. at PageID # 1, ¶ 2.) On March 18, 2024, the Court dismissed every claim except for Shapira's claims for unjust enrichment and breach of fiduciary duties. (DN 16.) Regarding the claim for unjust enrichment, the Court denied Defendants' Motion to Dismiss, noting "Defendants argue that Shapira benefitted from Fortuna Bourbon's sales through his ownership stake, and he was repaid with interest for the financing of Rare Character's supply pursuant to the revolving credit agreement. But this argument does not account for the fact that Shapira, through FBC, supplied existing Rare Character projects that predated his involvement." (DN 16, at PageID # 764-65.) The Court also denied Defendants' Motion to Dismiss Shapira's claim for breach of fiduciary duty, holding that Rare Character owed both Shapira and FBC fiduciary duties of loyalty, care, and good faith, and that Rare Character's decision to relocate barrels sourced under the Supply Agreement could have plausibly been a violation of its duties. (*Id*. at PageID # 767-68.)

Rare Character then asserted two counterclaims: one for tortious interference with contractual relations, and one for tortious interference with prospective economic advantage. (DN 21, at PageID # 806-809, ¶¶ 43-57.) In its counterclaims, Rare Character alleges that Shapira contacted bottlers that had existing contracts with it and made false and disparaging statements about Rare Character's ability to pay its debts, its ability to produce bourbon, and the integrity of its business. (*Id*. at PageID # 803, ¶ 25.) Rare Character also alleges that Shapira made these statements to distributors that were considering potential contracts with it. (*Id*. at PageID # 805, ¶ 36.)

Shapira served his First Set of Requests for Production of Documents on Defendants. (DN 32-1.) Rare Character objected to several of these requests and declined to produce documents responsive to these requests. (DN 32, at PageID # 849.) Rare Character objected on the grounds that the requests sought information that was not relevant to any remaining claim or defense in this matter. (*Id.*)

The Court held a telephonic status conference with the Parties to discuss their discovery dispute. (DN 31.) While the Parties were able to narrow their areas of disagreement, they were unable to resolve the dispute completely. Counsel for Shapira also advised the Court that he could not conduct necessary depositions without these documents. (*Id.*) Accordingly, the Court permitted counsel for Shapira to file the instant Motion to Compel. (DN 32.)

At issue are these Requests for Production:

1. Produce the most current Financial Notes for Fortuna Bourbon, along with any annual reports, quarterly reports, and/or transition reports for both Calendar Year 2023 and Calendar Year 2024, and all papers, documents, and accompanying exhibits submitted as part thereof and all prior drafts thereof, as well as any of Fortuna Bourbon's financial statements and financial statement schedules, accounting records, accountant work papers, audit reports, and any income statements, balance sheets, profit and loss statements, statements of cashflow, or general and/or subsidiary ledgers.
2. Produce the most current Financial Notes for Rare Character, along with any annual reports, quarterly reports, and/or transition reports for both Calendar Year 2023 and Calendar Year 2024, and all papers, documents, and accompanying exhibits submitted as part thereof and all prior drafts thereof, as well as any of Rare Character's financial statements and financial statement schedules, accounting records, accountant work papers, audit reports, and any income statements, balance sheets, profit and loss statements, statements of cashflow, or general and/or subsidiary ledgers.
3. Produce all financial records that refer to or relate to information concerning the assets and liabilities for Fortuna Bourbon for Calendar Years 2022 through 2024, including but not limited to records detailing the breakout of inventory, both barrels, dry goods, assets, and liabilities.
4. Produce all documents and communications concerning monthly inventory data for Fortuna Bourbon from August of 2022 to the present, including any inventory reports, and documents identifying shipment data, including the location of the inventory, bottled product, and cased-goods of all types, as well

any inventory not shipped, as has been detailed, and requested, by the Plaintiffs. (Amended Complaint, ¶¶ 111, 116, 121; *see id.* at Exhibits 4 and 5 to Amended Complaint).

5. Produce all documents and communications that refer to or relate to a breakdown of accounts receivable and accounts payable for Fortuna Bourbon, by month, from April 30, 2022 through May 30, 2023, including the total inventory, breakdown of barrels procured by Mr. Shapira for the use of the Rare Character Single Barrel Series line of products, the inventory of Rare Character products currently held by the Distributors, and as well as a breakdown of accounts receivable and accounts payable for Rare Character's Cask Series line of products, along with the total inventory, breakdown of barrels, and inventory of Rare Character's Cask Series line of products held by the Distributors.
6. Produce documents and communications referring to or relating to the gross sales and case volume by market for all Fortuna Bourbon's products and the stock keeping units (SKUs) for all Fortuna Bourbon's products, including those held by the Distributors detailed by Distributor per state.
7. Produce all documents referring to or relating to the gross sales and case volume of product sold utilizing barrels produced and/or financed by Mr. Shapira, including MGP 6-year-old barrel Rye, Barrels bought from Divine Spirits, and sales via Traditional Distributors and/or Non-Traditional Distributors, detailed by distributor per state.
8. Produce inventory data from August of 2022 to the present, including general barrel inventory data, location of that inventory, and any bottled inventory or barrels in process not shipped or in the Distributor's Warehouse and/or State Bailment for (i) Kentucky Straight Rye Bourbon produced by Heaven Hill only to be used in Fortuna Bourbon, including location, bottled product or in process barrels not shipped, by location, inventory of all Fortuna Bourbon's product at each Distributor warehouse; (ii) Kentucky Straight Malt produced by Heaven Hill by vintage/age, including bottled product or in process barrels not shipped, by location; (iii) all Malt product at each Distributor warehouse and/or Bailment; and (iv) MGP-barreled 51% 6-year Rye Whiskey purchased through the quarterly arrangement from Divine Spirits.
9. Produce all documents and communications that refer to or relate to outstanding loans (intercompany or otherwise), debts, credit card balances, by month, from April 30, 2022 through May 30, 2023, between Fortuna Bourbon and Rare Character or its members.
10. Produce all documents and communications that include details of any and all distributions from Fortuna Bourbon or Rare Character from August of 2022 to the present, including those in cash or in kind distributions.
12. Produce all documents and communications which refer to or relate to off-balance sheet financing arrangements for any barrels at Rare Character that existed after April 1, 2023.
13. Produce all documents and communications which refer to or relate to any current or past lines of credit, or pledges of security interests against the barrels of Kentucky Straight Malt Whiskey and bourbon distilled at Heaven Hill's Bernheim Distilled Spirits Plant (DSP) #1.

14. Produce all documents and communications which refer to or relate to any financing agreements from April 1, 2022 through May 30, 2023, in connection Fortuna Bourbon and Rare Character, for any barrels either via private investors, equity infusion, financial institutions, including but not limited to the loan agreement and documents relating to the loan obtained from George Ruan's parents in March and/or April of 2023. (*See* Amended Complaint, ¶¶ 68, 69).
15. Produce all communications with George Ruan, which refer to or relate to Mr. Shapira's involvement in Fortuna Bourbon.
16. Produce all documents and communications which refer or relate to compensation arrangements, including loans, salaries or other benefits for members of Fortuna Bourbon and Rare Character.
17. Produce all documents and communications that refer or relate to Mr. Nevenglosky's role or interest at Helmsman.
18. Produce all records of accounts payable or cash due to Rare Character by each month from April 30, 2022 to the current.
19. Produce all records of compensation to Mr. Nevenglosky from Helmsman as a direct or indirect result of business generated by Rare Character and/or Fortuna Bourbon.
20. Produce all documents and communications referring to or relating to the list of partners in Rare Bottling since January of 2023, including any correspondence regarding the formation of that entity on March 22, 2023, and any correspondence between Rare Character and Mark Carter regarding Mark Carter and/or the leasing of the warehouse space located at 1725 Dixie Highway, Louisville, Kentucky 40210 by Rare Character in April 2023.
21. Produce all documents and communications referring to or relating to any alterations, modifications, or alleged violations of the November 11, 2020 Rare Character Operating Agreement, since its inception to the current date.
22. Produce all documents and communications which identify members of Rare Whiskey Fund and documents and communications referring to or relating to all transactions involving Rare Whiskey Fund between April 1, 2022 and May 30, 2023.
23. Produce all documents and communications that refer to or relate to barrel financing between Rare Character, Fortuna Bourbon, and/or any affiliated entity and Allen Chi, Yule Qi, and/or Atlas Bold.
24. Produce all documents and communications between Rare Character and Bluegrass relating to or referring to payments owed or due to Bluegrass, including monthly outstanding balances, monthly inventory data, and any discussions regarding the removal of all barrels from Bluegrass's facility since April 1, 2022 to the present.
26. Produce all documents and communications referring to or relating to Mr. Shapira's relationship with Rare Character's vendors, including but not limited to Charlie Poulson and Americano, between March 1, 2023 and April 10, 2023.
27. Produce all documents and communications referring to or relating to the business structure and/or organization of Rare Character, and Fortuna Bourbon,

      including but not limited to the "Structural proposal," which was sent to Mr. Shapira on November 23, 2022 by Mr. Nevenglosky via email at 2:09 p.m.

31. Produce all documents and communications concerning the press release that the Rare Character Whisky Company was "re-enter[ing] the American Whiskey Market," including any and all drafts to the press release, as well as any and all documents or communications in which you objected to Mr. Shapira being characterized as "joining" Rare Character to relaunch the Fortuna brand, along with all records in which you agreed or objected to the characterization of Mr. Shapira being "responsible for Rare Character Whiskey." Rare Character Whiskey Company, "Historic Bourbon Brand to Re-Enter the American Whiskey Market," Sept. 20, 2022 at https://www.prnewswire.com/news-releases/historic-bourbon-brand-to-re-enter-the-american-whiskey-market-301628866.html.

40. Produce any business plans for Rare Character or for Fortuna Bourbon since April 1, 2022 to the present.

## II. Discussion

### A. Standard of Review

Matters of discovery are within the sound discretion of the trial court. *Chrysler Corp. v. Fedders Corp.*, 643 F.2d 1229, 1240 (6th Cir. 1981). The reviewing court reviews a ruling by the trial court limiting or denying discovery under an abuse of discretion standard. *Id.* An abuse of discretion exists when the reviewing court is "firmly convinced" that a mistake has been made. *Bush v. Rauch*, 38 F.3d 842, 848 (6th Cir. 1994).

### B. Motion to Compel

The scope of discovery includes any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case. FED. R. CIV. P. 26(b)(1). A party may request any other party to produce any designated documents or electronically stored information within the responding party's possession and within the scope of discovery. FED. R. CIV. P. 34(a)(1)(A). A party may move to compel a discovery response if the other party has failed to produce the requested documents. FED. R. CIV. P. 37(3)(B)(iv).

1.  **Relevance**[1]

Information must be relevant to be discoverable. FED. R. CIV. P. 26(b)(1). The Supreme Court has interpreted relevance broadly to include "any matter that bears on, or that reasonably could lead to other matter that could bear on," the claims or defenses of any party. *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978). Essentially, a request for discovery seeks relevant information if there is *any* possibility that the information sought may be relevant to a claim or defense of any party in the action. *Invesco Institutional (N.A.), Inc. v. Paas*, 244 F.R.D. 374, 380 (W.D. Ky. 2007). When an objection to relevance is raised or the relevance of the information sought is not apparent, the party seeking discovery must demonstrate that the requests are relevant to the claims or defenses in the action. *First Mercury Ins. Co. v. Babcock Enterprises, Inc.*, No. 3:21-CV-00672-GNS-CHL, 2024 WL 3939604, at *7 (W.D. Ky. Aug. 26, 2024). When the discovery material sought appears to be relevant, the party who is resisting production bears the burden of establishing that the material is not relevant, or that it is of such marginal relevance that the potential harm resulting from production outweighs the presumption in favor of broad disclosure. *Invesco*, 244 F.R.D. at 380. This party bears a heavy burden of demonstrating that disclosure will work a clearly defined and very serious injury. *Id*.

   a) **The requested information is relevant to Rare Character's counterclaims.**

Under Kentucky law, Rare Character must prove that Shapira maliciously, unjustifiably, or unlawfully interfered with its contractual relations or its prospective contractual relations to succeed on its claims for tortious interference. *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.*, 807

---

[1] Rare Character asserts that producing these documents would be unduly burdensome because they seek information that is not relevant. (DN 32-2, at PageID # 890.) Rare Character has not provided any other reason to argue that producing these documents would be unduly burdensome, so the Court will resolve the issue of undue burden together with relevance.

11

S.W.2d 476, 487 (Ky. 1991). Rare Character may succeed on its claims by proving that Shapira used fraud or deceit to interfere with its contracts and prospective contracts. *Id*. Rare Character must also establish damages with "a reasonable degree of certainty." *CMI, Inc. v. Intoximeters, Inc.*, 918 F. Supp. 1068, 1080 (W.D. Ky. 1995). Accordingly, evidence of whether Shapira lied about Rare Character's finances and its relationship with him, as well as evidence concerning Rare Character's damages, will be relevant to Rare Character's counterclaims.

Here, Shapira requests information that is relevant to Rare Character's counterclaims of tortious interference. Rare Character's counterclaims hinge on its allegation that Shapira misrepresented to its current and prospective business partners that it was financially unstable and unable to pay its debts, and by sending letters misrepresenting the nature of the Parties' relationships and contractual obligations. (DN 21, at PageID # 807, ¶¶ 46-47.) Request Nos. 2, 9, 10, 12-14, 18, 23, and 24 seek information that reflects Rare Character's financial health, thus bearing on whether Shapira's alleged statements concerning its ability to pay its debts were false. Request Nos. 15, 27, and 31 all relate to Shapira's relationship with the Parties, and thus are relevant to Rare Character's claims that Shapira misrepresented his relationship with the Parties.

Under Kentucky law, a person liable for tortious interference with existing or prospective contractual relations is liable for the pecuniary damages that flow from his or her interference. *CMI, Inc.*, 918 F. Supp. at 1080-81. Rare Character alleges that Shapira's interference caused it to lose business opportunities and suffer damages that are still ongoing. (DN 21, at PageID # 808, ¶¶ 55-56.) Rare Character also alleges that it suffered harm by the delay in bottling, distributing, and selling caused by Shapira's alleged interference. (*Id*. at PageID # 807, ¶ 49.) While the information reflecting Rare Character's financial health would be relevant to its calculation of damages, Request Nos. 20 and 40 would also be relevant because they request information that

12

reflects Rare Character's ability to perform on its contracts and its expectations in profiting from those contracts. Accordingly, the requested information is relevant to Rare Character's counterclaims.

Rare Character asserts that Shapira does not need these documents to assess damages because it has already quantified those damages in an expert report that it plans to produce. (DN 35, at PageID # 946.) Even if this were true, that would not render the requested information irrelevant. Shapira would need the financial documents to evaluate for himself what the proper measure of damages was for Rare Character's claims of tortious interference, and to rebut Rare Character's report. Rare Character also asserts that the financial harm for the loss of business opportunities would not be reflected in the financial documents sought by Shapira, but that would only be true if Rare Character's only damages were for lost profits or lost revenue from prospective contracts. Rare Character also alleges damages from Shapira's interference with *existing* contracts, and that is measured by the pecuniary harm that Rare Character suffered. In any event, the measure of lost profits is only one way that courts can establish those damages with reasonable certainty. *CMI, Inc.*, 918 F. Supp. at 1081. ("Lost profits is an ascertainable measure of damages.").

          **b)**    **The requested information is relevant to Shapira's claim of unjust enrichment.**

Under Kentucky law, to succeed on a claim for unjust enrichment, Shapira must prove that: (1) he conferred a benefit upon Rare Character at his expense; (2) Rare Character appreciated the benefit; and (3) it would be inequitable for Rare Character to retain the benefit without payment for value. *Furlong Dev. Co., LLC v. Georgetown-Scott Cnty. Plan. and Zoning Comm'n*, 504 S.W.3d 34, 39-40 (Ky. 2016) (quoting *Jones v. Sparks*, 297 S.W.3d 73, 78 (Ky. Ct. App. 2009)). Shapira's claim for unjust enrichment depends on his assertion that he could secure discounted

13

goods for Rare Character through his connections, and his assertion that Rare Character profited from his connections.

The requested information would bear on the benefit Shapira conferred on Rare Character at his expense. Shapira alleges that his connections and strong reputation in the spirits industry enabled him to obtain choice goods at significantly cheaper prices, as well as secure financing and business relationships with various retailers. (DN 1-1, at PageID # 111-12, ¶ 25.) Request Nos. 7 and 26 relate to Shapira's relationships with Rare Character's vendors, as well as the sales that Rare Character made from the goods that Shapira secured. Request No. 5 relates to the barrels that Shapira procured for Rare Character. Request Nos. 16, 17 and 19 relate to the compensation that Rare Character's members received from business generated by Rare Character, and thus reflect the benefits that Rare Character and its members received from Shapira's connections. Accordingly, the requested information is relevant to Shapira's claim for unjust enrichment.

Contrary to Rare Character's assertion, the Court did not "limit" Shapira's claim for unjust enrichment to projects that predated Fortuna Bourbon. The Court referred to the fact that Rare Character may have enjoyed a benefit from Shapira's assistance on projects that predated Fortuna Bourbon's formation as a basis for not dismissing Shapira's claim. (DN 16, at PageID # 765.) These benefits almost certainly could have extended beyond the date that Fortuna Bourbon was formed, and the requested information would shed light on those benefits. (DN 1-1, at PageID # 140, ¶ 137.) ("The conferred benefits will result in Rare Character experiencing a financial gain and benefit through the distribution and sale of Rare Character's products fueled by Shapira's sourced barrels and fostered relationships."). In any event, this information relates to Shapira's relationship with Rare Character, and thus bears on Rare Character's assertion that Shapira

14

misrepresented to third parties his relationship with it. The Court thus does not see a reason to limit the timeframe of documents that must be produced.

Accordingly, the Court finds that the requested information is relevant to Shapira's claim for unjust enrichment. The requested information bears on Shapira's ability to secure goods at cheaper prices for Rare Character, in addition to Shapira's ability to connect with investors and retailers. Moreover, the financial benefit that Rare Character enjoyed from Shapira's contributions would likely be reflected in this information.

### c) The requested information is relevant to Plaintiff's claim for breach of fiduciary duties.

Delaware law controls the obligations of Rare Character and Fortuna Bourbon as LLCs formed in Delaware. (DN 16, at PageID # 767.) Under Delaware law, managers of an LLC owe traditional duties of loyalty and care to its members. *William Penn P'ship v. Saliba*, 13 A.3d 749, 756 (Del. 2011). These duties include a duty to its members to make good faith efforts to ensure that the LLC fulfills its contractual obligations to its members. *See Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techns. Inc.*, 854 A.2d 121, 153 (Del. Ch. 2004).

Here, Shapira alleges that Rare Character owed contractual duties to Shapira's entity, 7th Heaven, under the Supply Agreement. (DN 1-1, at PageID # 140, ¶¶ 142-43.) By relocating the barrels supplied under the agreement, Rare Character allegedly violated the Supply Agreement, potentially harming Fortuna Bourbon and Shapira. (DN 16, at PageID # 767.) ("While Fortuna Bourbon was not a party to the supply agreement, it is plausible that causing FBC's supply agreement to be damaged would have also damaged Fortuna Bourbon, as the amended complaint alleges."). Request Nos. 4 and 8 seek information that bears on the location of the barrels, and thus would relate to Shapira's allegation that Rare Character violated the Supply Agreement by relocating them. Request Nos. 1, 3-6, 9, 10, and 16 also seek information that reflects the financial

15

health of Fortuna Bourbon and is thus relevant to show the damages that Fortuna Bourbon may have incurred because of Rare Character's alleged breach. Accordingly, the requested information is relevant to Shapira's claim for breach of fiduciary duties.

### d) Shapira requests some information that is not relevant.

Although most of the requests seek information that is relevant, some of the requests seek information that is not. Request Nos. 21 and 22 both seek information that the Court does not find relevant. The Court does not see how the information requested is relevant to the relocation of the barrels, the benefit that Shapira conferred on Rare Character, or Rare Character's counterclaims for tortious interference, nor does Shapira explain why this information would be relevant. Accordingly, the Court finds that these requests seek information that is not discoverable.

### 2. The Court will not award Shapira payment for his expenses in prosecuting this Motion.

Under Rule 37, if a court grants a Motion to Compel in part, then the court may issue any protective order authorized under Rule 26(c) and may, after giving an opportunity to be heard, apportion the reasonable expenses for the Motion. FED. R. CIV. P. 37(a)(5)(C). When parties have taken legitimate positions, and the court grants a motion to compel in part, then courts generally conclude that justice requires that each party be responsible for their own fees and costs. *Benavidez v. Sandia Nat'l Lab'ys*, 319 F.R.D. 696, 720 (D.N.M. 2017). As the Court has decided to grant Shapira's Motion in part, and both Parties have advanced reasonable positions, the Court does not believe it is appropriate to award Shapira payment for his expenses in prosecuting this Motion.

### III. Order

For the foregoing reasons,

IT IS HEREBY ORDERED that:

16

(1) Plaintiff Andrew Shapira's Motion to Compel (DN 32) is **GRANTED in part**. On or before **February 7, 2025**, Defendant Rare Character Whiskey Co., LLC shall produce information and documents responsive to Request Nos. 1-10, 12-20, 23, 24, 26, 27, 31, and 40 in Plaintiffs' First Set of Requests for Production of Documents to Defendants. (DN 32-1.)

(2) On or before **February 21, 2025**, the Plaintiffs shall conduct the remaining depositions that depend on the production of these documents.

(3) Defendant Rare Character Whiskey Co., LLC shall not be required to pay Plaintiff Andrew Shapira's reasonable expenses in prosecuting this Motion.

January 27, 2025

Colin H Lindsay, Magistrate Judge
United States District Court

cc: Counsel of record