UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

ANDREW SHAPIRA, *et al.*                                                                 Plaintiffs

v.                                                                    Civil Action No. 3:23-cv-602-RGJ

RARE CHARACTER WHISKEY CO., LLC,                                          Defendants
*et al.*

\* \* \* \* \*

### ORDER ACCEPTING REPORT AND RECOMMENDATION

Plaintiffs, Andrew Shapira ("Shapira"), 7th Heaven, LLC ("7th Heaven"), and Fortuna Bourbon Company, LLC ("FBC") (collectively, "Plaintiffs") moved to strike[1] [DE 50]. Plaintiffs' motion was referred to United States Magistrate Judge Colin H. Lindsay for report and recommendation. [DE 51]. Defendant Rare Character Whiskey Co., LLC ("Rare Character") responded [DE 56] and Plaintiffs replied [DE 59]. Judge Lindsay entered his Report and Recommendation [DE 64] on October 14, 2025, recommending that the motion be granted in part and denied in part. Counsel for Rare Character, Stites & Harbison, PLLC ("Stites & Harbison"), timely filed objections. [DE 65]. Plaintiffs responded. [DE 66]. This matter is ripe for adjudication. For the reasons below, the Court **OVERRULES** Defendants' Objections [DE 65], and **ACCEPTS** Magistrate Judge Lindsay's Report and Recommendation [DE 64]. Plaintiffs' Motion is GRANTED in part and DENIED in part.

---

[1] Plaintiffs also seek attorney fees and costs. [*See id.* ("Motion to Strike Answer to Complaint, Counterclaim, and for Attorney Fees and Costs")].

## I. BACKGROUND

### A. Factual Background

Plaintiffs' complaint arises from the deterioration of the business relationship between Shapira and his partners, Pablo Moix ("Moix") and Peter Nevenglosky ("Nevenglosky"). Shapira, Moix, and Nevenglosky entered a joint business venture, combining their different professional backgrounds. Shapira had experience in his family-owned distilled spirits business, as well as experience as an investment banker on Wall Street. [DE 1-1 at 108]. Moix had experience in hospitality, bars, and restaurants. [*Id.* at 109]. Nevenglosky had experience in marketing and "premium niche spirit brands." [*Id.* at 110]. As a joint venture, they decided to launch Fortuna Bourbon Whiskey as part of Rare Character's product offerings via a new entity with all three as members. [*Id.* at 110].

Shapira alleges his contributions to the joint venture included utilizing his industry connections to obtain specific barrels of bourbon and whiskey; procuring those barrels at lower costs; utilizing his relationships with distributors, retailers, and liquor regulators; providing financial assistance; and leveraging his professional experience. [*Id.* at 111–12]. In return, Shapira would own 25% of Fortuna Bourbon, LLC ("Fortuna Bourbon"), and all new projects pursued jointly by Shapira and Rare Character would fall under Fortuna Bourbon's label. [*Id.* at 112–13]. Additionally, Shapira alleges that it was "understood that for any other projects already in progress that would benefit from Shapira's assistance, Rare Character would compensate Mr. Shapira via a commission or sales charge of ~25%." [*Id.* at 113].

At the beginning of the collaboration, Shapira had a blood infection and was hospitalized for over a month in April 2021. [*Id.* at 114]. Once recovered, he created 7th Heaven as the entity through which he did business with Rare Character and FBC as the entity through which he would

source whiskey for Rare Character and Fortuna Bourbon. [*Id.*]. 7th Heaven became the entity through which Shapira owned 25% of Fortuna Bourbon. [*Id.* at 116]. Rare Character owned 75% of Fortuna Bourbon. [*Id.*]. Through FBC, Shapira sourced hundreds of barrels through a confidential supply agreement to benefit Fortuna Bourbon and Rare Character. [*Id.* at 115, 262–68].

FBC entered into a Confidential Whiskey Supply Agreement ("Supply Agreement") with a distiller to purchase rye-based bourbon whiskey to be used under the Fortuna label and trademark or for other similar projects with Rare Character. [*Id.* at 114-15]. Under the Supply Agreement, FBC could procure the barrels under specific terms and conditions. [*Id.*]. One of these terms was that if, for any reason, Shapira was no longer involved in or no longer benefited from the sale, then the supplier could terminate the contract at any time. [*Id.* at 115]. The supplier also retained the right to repurchase the barrels in the event they were not utilized as contemplated under the Supply Agreement. [*Id.*]. The agreement further provided that the supplier would sell FBC an additional 605 barrels of Kentucky straight malt whiskey under the same terms and conditions of the Supply Agreement, but the supplier permitted FBC to use those barrels under labels other than the Fortuna label and trademark, including use in the "Rare Character Exceptional Cask Series" offering. [*Id.*]

In a press release, Rare Character advertised that Shapira was "joining" it. [*Id.* at 117]. When demand increased, Shapira provided $1 million via a revolving line of credit agreement and sourced additional barrels through separate suppliers. [*Id.* at 117–18]. By March 2023, for various reasons, Shapira became worried that Rare Character would not be able to pay its debt to him, and that Rare Character would be unable to pay its suppliers, bottlers, and other business partners. [*Id.* at 124-25]. Additionally, Shapira's relationship with Moix and Nevenglosky began to fray. Plaintiffs allege that Moix and Nevenglosky ignored Shapira's advice about purchasing

3

agreements with suppliers such as MGP, declined financing opportunities provided by Shapira, and cut Shapira out of critical communications and decision-making on behalf of the business. [*Id.* at 119–22]. Shapira repeatedly expressed his concerns about the financial health of the business, the management of the operation, and the way Moix and Nevenglosky behaved toward external business partners such as bottlers, distributers, and suppliers. [*Id.* at 122–33]. Shapira became increasingly concerned not only about the health of the joint business venture with Moix and Nevenglosky, but also about preserving his own reputation within the industry. [*Id.*]. As a result, Shapira retained counsel. [*Id.* at 133].

After retaining counsel and seeking disclosure of financial records from Rare Character, Rare Character eventually paid the "payoff amount" due on the revolving credit agreement to 7th Heaven. [*Id.* at 135]. But Rare Character, Moix, and Nevenglosky never disclosed to Shapira where barrels he sourced were located. [*Id.* at 137]. Plaintiffs allege that at least some of the barrels had been shipped to Indiana at the direction of Rare Character, Moix, and Nevenglosky, which eliminated the possibility of selling them under the Fortuna Bourbon label and diminished their value. [*Id.* at 138–39].

### B. Procedural History

Subsequently, Plaintiffs filed this lawsuit in Jefferson Circuit Court, alleging claims against Rare Character, its members, and some of its business partners, for breach of contract, unjust enrichment, fraudulent misrepresentation, breach of fiduciary duty, and aiding and abetting breach of fiduciary duty. [*Id.* at 1]. However, Defendants removed this action to this Court on October 25, 2023, after the Jefferson Circuit Court dismissed the last remaining non-diverse party. [*Id.*]. And on March 18, 2024, this Court dismissed every claim except for Plaintiffs' claims for unjust enrichment and breach of fiduciary duties. [DE 16].

On July 12, 2024, Plaintiffs sent Rare Character document requests for the "accounting records" for Fortuna Bourbon and for Rare Character for Calendar Years 2023 and 2024, including the "general and/or subsidiary ledgers" for both of those entities, as well as requests for records regarding the location of barrels and inventory data for Rare Character and Fortuna Bourbon. [DE 32-1 at 870-71]. Rare Character objected to Plaintiffs' requests on the basis that the information sought was "not relevant to any remaining claim or defense in this lawsuit." [DN 32-2 at 890-91].

Magistrate Judge Lindsay then held a telephonic status conference with the Parties to discuss this discovery dispute. [DN 31]. While the Parties were able to narrow their areas of disagreement, they were unable to resolve the dispute. Magistrate Judge Lindsay permitted Plaintiffs to file a motion to compel, which was subsequently granted. [DE 42]. Rare Character was ordered to "produce information and documents responsive to Request Nos. 1-10, 12-20, 23, 24, 26, 27, 31, and 40 in Plaintiffs' First Set of Requests for Production of Documents to Defendants." [*Id.* at 988]. Relevant here, Rare Character was ordered to respond to the following requests:

> 1. Produce the most current Financial Notes for Fortuna Bourbon, along with any annual reports, quarterly reports, and/or transition reports for both Calendar Year 2023 and Calendar Year 2024, and all papers, documents, and accompanying exhibits submitted as part thereof and all prior drafts thereof, as well as any of Fortuna Bourbon's financial statements and financial statement schedules, accounting records, accountant work papers, audit reports, and any income statements, balance sheets, profit and loss statements, statements of cashflow, or general and/or subsidiary ledgers.
>
> 2. Produce the most current Financial Notes for Rare Character, along with any annual reports, quarterly reports, and/or transition reports for both Calendar Year 2023 and Calendar Year 2024, and all papers, documents, and accompanying exhibits submitted as part thereof and all prior drafts thereof, as well as any of Rare Character's financial statements and financial statement schedules, accounting records, accountant work papers, audit reports, and any income statements, balance

> sheets, profit and loss statements, statements of cashflow, or general and/or subsidiary ledgers.

[DE 42 at 978, 983, 987 (finding that these requests were relevant to Rare Character's counterclaims because they reflected the financial health of Rare Character and Fortuna Bourbon)]. The parties were ordered to conduct depositions dependent on the production of these documents by February 21, 2025, which was subsequently extended to March 14, 2025. [*See id.* at 988; DN 46 at 1003].

Following the Order on Plaintiffs' Motion to Compel, on February 7, 2025, Rare Character produced the following financial records:

- 2022 Tax Return for Fortuna Bourbon
- 2023 Tax Return for Fortuna Bourbon
- 2023 Balance Sheet for Fortuna Bourbon
- 2024 Balance Sheet for Fortuna Bourbon
- 2023 Profit and Loss Statement for Fortuna Bourbon
- 2024 Profit and Loss Statement for Fortuna Bourbon
- 2023 Balance Sheet for Rare Character
- 2024 Balance Sheet for Rare Character
- 2023 Profit and Loss Statement for Rare Character
- 2024 Profit and Loss Statement for Rare Character

[DE 56 at 1083]. However, Rare Character did not produce certain accounting records, including general ledgers.

Plaintiffs deposed Nevenglosky on March 12, 2025. [DE 50-1 at 1027]. "Nevenglosky explained that Rare Character employs a third-party consultant, Michael Applebaum, to maintain the books and accounting records for Rare Character and Fortuna Bourbon, and that the information is maintained in a QuickBooks database." [DE 56 at 1085]. When asked why Rare Character had not produced a general ledger for Fortuna Bourbon, Nevenglosky testified "I don't believe it was requested, nor was the QuickBooks requested. We provided what we thought would

6

address the request." [DE 50-1 at 1028 (20:3–9)]. Nevenglosky went on to testify that, with respect to Plaintiffs' requests for accounting records to Fortuna Bourbon, Rare Character produced only "the income statement and balance sheet" because that was "the entirety of what we create for financial records for Fortuna Bourbon, LLC." [*Id.* (21:12–20)]. For the same reason, Rare Character did not produce "the general ledger or QuickBook[s] files for Rare Character either." [*Id.* at 1029 (23:3–15)].

Following the deposition of Nevenglosky, on March 27, 2025, counsel for Plaintiffs wrote to Defendants asserting that "Rare Character was clearly ordered to produce the QuickBooks accounting records and general ledgers for Rare Character and for Fortuna Bourbon." [DE 50-2 at 1038]. Plaintiffs requested that Rare Character produce "all accounting records for Rare Character and Fortuna Bourbon, including but not limited to the QuickBooks accounting records and general ledgers for Rare Character and for Fortuna Bourbon." [DE 50-2 at 1039].

Counsel for Rare Character responded by letter on April 7, 2025. [*See* DE 50-3]. The letter claimed that Rare Character had complied with the Order compelling production of documents in response to "Plaintiffs' RFPD Nos. 1 & 2," and explained that "[n]owhere in the RFPDs or the Court's order is QuickBooks mentioned. . . . The only financial documents that Rare Character and Fortuna Bourbon use for accounting purposes are those that were produced." [*Id.* at 1042]. The letter further stated that "the only way to access this information is to be granted access as a user to [Rare Character's] QuickBooks database" and that "[f]or obvious reasons," Plaintiffs would not be given "unfettered access to a database that contains every piece of financial information about our [Rare Character]." [*Id.* at 1042–43]. Finally, counsel for Rare Character offered the following concession:

> While we do not believe that any other information is responsive to your requests, if you would like to request certain reports (e.g., general ledger), we can create

7

> reports that have not been created or used by Rare Character or Fortuna Bourbon in their business for any reason, and thus would be created by us for the first time, specifically in response to your RFPDs. We will need to redact information that is highly confidential (i.e., payments made by our client to our law firm or other attorneys), and any reports generated would be subject to an "attorneys' eyes only" confidentiality and produced pursuant to a signed agreement to that effect.

[*Id.* at 1043]. Following receipt of this letter, Plaintiffs filed the Motion to Strike. [DE 50].

Magistrate Judge Lindsay held a status conference to "discuss Plaintiffs' Motion to Strike [] and the discovery on which that Motion is based" on May 7, 2025.

> During the conference, counsel for Defendants asserted that Defendants only produced the documents their clients routinely *use*, not every document they had access to. In particular, Defendants asserted that, while they could have queried QuickBooks for the requested information, they did not do so because they did not make or use such documents in the operation of their business. Defendants further took the position that QuickBooks does not contain documents, only data.

[DE 55 at 1079]. An attorney for Stites & Harbison represented that he had made the decision not to produce the QuickBooks records:

> I had a conversation with our client. I asked him what documents were utilized in the operation of the business. He told me there were certain documents that were used. Those documents were produced out of QuickBooks.

[DE 65 at 1175].[2] Magistrate Judge Lindsay "advised Defendants' counsel that the mere location of information within QuickBooks was not a valid reason to resist discovery, nor was it an acceptable excuse from complying with an order from the Court." [DE 55 at 1079].

Immediately following this conference, and in light of Magistrate Judge Lindsay's admonishments, Rare Character did produce the requested documents:

---

[2] Somewhat inconsistently, counsel for Rare Character submitted an affidavit claiming that "[o]n March 12, 2025, we learned, for the first time, from the deposition testimony of Rare Character's representative, Peter Nevenglosky, that Rare Character and Fortuna Bourbon utilize QuickBooks." [65-1 at 1179 ("Counsel Affidavit")].

8

> After working through the types of reports QuickBooks could generate and the kind of information existing in the database, in the early afternoon that same day—despite its disagreement that the entirety of the information contained in the QuickBooks database for the relevant period had been requested in discovery or that Plaintiffs were entitled to it—Rare Character's counsel called counsel for Plaintiffs to resolve the dispute and arrange the production of documents. Counsel for Rare Character worked with Michael Applebaum that afternoon to generate multiple QuickBooks reports (Balance Sheet, Profit and Loss, Customers, Employees, General Ledger, Journal, Trial Balance, and Vendors) regardless of whether Plaintiffs had requested them. Those reports are effectively the entire database for the relevant period, for both Rare Character and non-party Fortuna Bourbon, and were produced later in the afternoon on May 7. Plaintiffs' counsel also requested additional information, which was produced the next day.

[DE 56 at 1090].

Following briefing on Plaintiffs' Motion [DE 50], Magistrate Judge Lindsay issued a Report and Recommendation denying Plaintiffs' request for case-dispositive sanctions, but, awarding attorneys' fees and costs incurred in relation to the Motion to Strike [DE 50], the May 7, 2025 Telephonic Status Conference [DE 55], and the March 27, 2025 correspondence with Defendants' counsel [DN 55-2]. [*See* DE 64 at 1149 (awarding attorney fees pursuant to Fed. R. Civ. P. 37(b)(2))]. Stites & Harbison timely filed its objections in its capacity as the sanctioned party. [DE 65].[3] Rare Character did not file a separate objection.

## II.     STANDARD

When reviewing a report and recommendation, the Court reviews de novo "those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1)(C). The Court may adopt without review any portion of the report to which no

---

[3] Before "an attorney can be sanctioned under Federal Rules of Civil Procedure . . . 37(b)(2)(C), . . . a party or attorney must be afforded notice and an opportunity to be heard." *KCI USA, Inc. v. Healthcare Essentials, Inc.*, 797 F. App'x 1002, 1006 (6th Cir. 2020). A "full evidentiary hearing is not needed when the court has sufficient relevant information, including pleadings or materials filed in the record, to decide." *Banner v. City of Flint*, 99 F. App'x 29, 37 (6th Cir. 2004).

9

objection is made. *See Thomas v. Arn*, 474 U.S. 140, 150 (1985). Upon review, the Court "may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions." Fed. R. Civ. P. 72(b)(3).[4]

Relevant here, Rule 37 confers discretionary authority on the Court to impose sanctions on a party for its failure to "obey an order to provide or permit discovery." *See* Fed. R. Civ. P. 37(b)(2). Regardless of whether the Court chooses to impose more severe sanctions, the Court "*must* order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, *unless* the failure was substantially justified or other circumstances make an award of expenses unjust." *Id.* (emphasis added). *Compare Boles v. Aramark Corr. Servs., LLC*, No. 17-1919, 2018 WL 3854143, at *4 (6th Cir. Mar. 19, 2018) (affirming denial of motion for costs where defendants opposed discovery based on a mistaken interpretation of the court's case-management order but where defendants' interpretation had not been unreasonable), *with Fausz*, 2017 WL 1227943 (overruling objections to sanctions where defendants "chose to construe the Court's [order compelling discovery] in such a fashion as to thwart the efforts of [plaintiff] to obtain information and documents clearly relevant to her [] claims").

In the Sixth Circuit, a court generally need not make a finding of bad faith before sanctioning a party under Rule 37. *Youn v. Track, Inc.*, 324 F.3d 409, 421 (6th Cir. 2003). But if a

---

[4] Plaintiffs are mistaken that the "clearly erroneous or contrary to law" standard of review applies because an award of fees is not dispositive. [*See* DE 66 at 1216 (citing *Fausz v. NPAS, Inc.*, No. 3:15-CV-00145-CRS-DW, 2017 WL 1227943, at *2 (W.D. Ky. Mar. 31, 2017); *Bliss Collection, LLC v. Latham Companies, LLC*, 2021 WL 8314384, at *1 n.1 (E.D. Ky. Nov. 18, 2021))]. The matter submitted to Magistrate Judge Lindsay was a case-dispositive motion to strike Defendants' pleadings. [DE 50]. And unlike *Fausz*, this Court is reviewing a report and recommendation, not "a magistrate judge's order on a non-dispositive matter." *Fausz*, 2017 WL 1227943, at *2. Here, the report and recommendation was filed "[p]ursuant to 28 U.S.C. § 636(b)(1)(B)-(C)" [DE 64 at 1150], and so the Court reviews the objections de novo. 28 U.S.C. § 636(b)(1)(C).

court intends to dismiss a party's lawsuit as a sanction under Rule 37, the court must consider following factors: (1) whether the party's failure is due to willfulness, bad faith, or fault; (2) whether the adversary was prejudiced; (3) whether the party was warned that failure to cooperate could lead to dismissal or entry of default judgment; and (4) whether less drastic sanctions were imposed or considered before dismissal or default judgment was ordered. *Freeland v. Amigo*, 103 F.3d 1271, 1277 (6th Cir. 1997).

### III. DISCUSSION

Stites & Harbison asserts the following objections: (1) that the record does not support a finding that Rare Character was "dilatory"; (2) that the record does not support a finding that Rare Character's noncompliance with the Court's January 2025 Order was "willful"; (3) that Plaintiffs were not prejudiced by Rare Character's conduct; (4) that monetary sanctions were not appropriate; and (5) that sanctioning Stites & Harbison, specifically, was unwarranted based on the record. [*See* DE 65].

#### A. Whether Rare Character was "dilatory"

Stites & Harbison first argues that neither Rare Character or its counsel were dilatory because "in compliance with the January 2025 Order, Stites & Harbison produced all *then-existing responsive documents* in Rare Character's and Fortuna Bourbon's possession by the Court-ordered deadline of February 7, 2025." [*Id.* at 1163 (emphasis added) (citing DE 65-3)]. And, because the "January 2025 Order . . . made no mention of QuickBooks or any other database," Stites & Harbison contend that they should not be blamed for failing to produce "QuickBooks records that did not exist at the time, and that neither Rare Character nor Fortuna Bourbon use in the course of their business." [*Id.*]

To the extent Stites & Harbison argues Defendants were "in compliance with the January 2025 Order," the Court finds this contention is meritless. First, the record is undisputed that the QuickBooks database "existed" at all relevant times. [*Id.*]. Indeed, the Objections concede that the reports Defendants eventually produced "could [have] be[en] generated." [*Id.*]. Second, whether any such reports were "use[d] in the course of their business" has no bearing on whether they were responsive to Plaintiffs' requests for "any . . . accounting records . . . or general and/or subsidiary ledgers" which Rare Character was ordered to produce. [DE 42 at 978]. And Defendants do not contest that they were "in error." [DE 65 at 1165].

However, it is true that "within 24 hours of [Magistrate Judge Lindsay's] directive, Stites & Harbison produced all of the reports that could be generated from Rare Character's and Fortuna Bourbon's QuickBooks database." [*Id.* at 1164].[5] Even so, that was still nearly two months after it was revealed that certain accounting records were maintained in QuickBooks, and only after Plaintiffs resorted to motion practice. Thus, while the Court does not find that "Defendants dragged their feet" or otherwise engaged in dilatory tactics, there is no question that Defendants did not timely comply with the January 2025 Order. [DE 64 at 1132].

### B. Whether Rare Character's non-compliance was reasonable

Having concluded that Defendants did "fail[] to obey an order to provide or permit discovery," the Court finds that most of Stites & Harbison's objections are immaterial to the question of whether monetary sanctions were appropriate under Rule 37(b). Fed. R. Civ. P. 37. For example, Stites & Harbison argue that Magistrate Judge Lindsay erred in finding that Rare Character or its counsel's failure to comply with their discovery obligations was "due to

---

[5] Moreover, Defendants did attempt to collaborate with Plaintiffs to produce some, albeit not all, of the requested records. For example, Defendants' counsel offered to belatedly produce general ledgers from QuickBooks, subject to redactions and the execution of a confidentiality agreement.

12

willfulness [or] bad faith." [DE 65 at 1165]. Specifically, they argue that "Stites & Harbison never questioned the Court's authority to order production of the QuickBooks records" but, rather, that they "genuinely did not perceive the Court's January 2025 Order to encompass QuickBooks records." [*Id.* at 1165, 68]. But whether Defendants acted in good faith is largely immaterial because the Magistrate assessed only monetary sanctions under Rule 37, which does not require a finding of bad faith. *Youn*, 324 F.3d at 421. Indeed, the Court is *required* to award "reasonable expenses" caused by Defendants' failure to turn over the QuickBooks records, "unless the failure was substantially justified or other circumstances make an award of expenses unjust." Fed. R. Civ. P. 37. In the Sixth Circuit, "[a] motion is 'substantially justified' if it raises an issue about which 'there is a genuine dispute, or if reasonable people could differ as to the appropriateness of the contested action.'" *Doe v. Lexington-Fayette Urb. Cnty. Gov''t*, 407 F.3d 755, 765 (6th Cir. 2005) (quoting *Pierce v. Underwood*, 487 U.S. 552, 565 (1988)). In other words, the justification must be reasonable.[6]

Stites & Harbison primarily argues that the failure to produce QuickBooks records was reasonable because "Plaintiffs did not request accounting databases in their discovery requests or in their motion." [DE 64 at 1159; *see also id.* ("[F]rom Stites & Harbison's perspective, Plaintiffs did not have an existing discovery request for the QuickBooks accounting databases."). This argument was addressed and correctly rejected by Magistrate Judge Lindsay. As noted in the Report and Recommendation, the Federal Rules permit a party to request "any designated documents or electronically stored information – including writings, drawings, graphs, charts, photographs, sound recordings, images, and *other data or data compilations* – stored in any medium from which information can be obtained either directly or, if necessary, after translation

---

[6] Here, Magistrate Judge Lindsay found that Defendants' conduct was both "willful and *unreasonable*." [DE 64 at 1140 (emphasis added)].

by the responding party into a reasonably usable form." Fed. R. Civ. P. 34(a)(1)(A) (emphasis added). And Plaintiffs' requests define "document" to have the "broadest possible meaning under the Federal Rules of Civil Procedure," including "data compilations from which information can be obtained or translated, if necessary." [DE 32-1 at 863]. Thus, to the extent that Defendant's "financial statements and financial statement schedules, accounting records, accountant work papers, audit reports, and any income statements, balance sheets, profit and loss statements, statements of cashflow, or general and/or subsidiary ledgers" could be obtained from QuickBooks, they were within the scope of the requests that Rare Character was ordered to produce. [DE 42 at 978].

Contrary to Stites & Harbison's claim that "[i]t is not reasonable to conclude . . . that 'accounting records' would mean that Rare Character and Fortuna Bourbon needed to generate records from a broader database," [DE 65 at 1154], that is precisely what courts routinely require. *See Apple Inc. v. Samsung Elecs. Co.*, 2013 WL 4426512, at *3 (N.D. Cal. Aug. 14, 2013) ("While this court has held that a party should not be required to create completely new documents, that is not the same as requiring a party to query an existing dynamic database for relevant information. Courts regularly require parties to produce reports from dynamic databases."). *Accord Elliot v. Humana, Inc.*, No. 3:22-CV-00329-RGJ-CHL, 2024 WL 4468654, at *6 (W.D. Ky. Oct. 10, 2024), *objections overruled*, No. 3:22-CV-329-RGJ, 2024 WL 4545985 (W.D. Ky. Oct. 22, 2024); *Meredith v. United Collection Bureau, Inc.*, 319 F.R.D. 240, (N.D. Ohio 2017). The cases cited by Stites & Harbison for the proposition that "it is well settled that a party need not create documents

in response to discovery requests" are entirely inapposite. None of those cases considered requests to query reports from existing databases.[7]

Moreover, Defendants' decision not to produce certain accounting records located within QuickBooks cannot be justified because the record shows that Rare Character and its counsel failed to reasonably investigate whether responsive records existed within the database in the first place. Indeed, according to the Objections, "Stites & Harbison did not even know the Defendants used QuickBooks until Nevenglosky's deposition on March 12, 2025. . . . Consequently, Stites & Harbison did not know to ask the Defendants to query a database Stites & Harbison did not know existed." [DE 65 at 1167 (citations omitted)]. Stites & Harbison's failure to inquire about the QuickBooks database was inconsistent with their duty to investigate whether Defendants were in possession of responsive accounting records. As other courts in the Sixth Circuit have observed,

> [a]ttorneys are dutybound to meaningfully interview relevant custodians "to learn the relevant facts regarding [Electronically Stored Information (ESI)] and to identify, preserve, collect, and produce the relevant ESI." . . . And an attorney may not simply rely on custodian self-collection of ESI. Instead, counsel must "test the accuracy of the client's response to document requests to ensure that all appropriate sources of data have been searched and that responsive ESI has been collected—and eventually reviewed and produced."

*Waskul v. Washtenaw Cnty. Cmty. Mental Health*, 569 F. Supp. 3d 626, 635–36 (E.D. Mich. 2021) (quoting *DR Distributors, LLC v. 21 Century Smoking, Inc.*, 513 F. Supp. 3d 839, 923–926 (N.D. Ill. 2021)).

---

[7] *See Pogue v. Northwestern Mutual Life Insurance Co.*, 3:14-CV-598-CRS-CHL, 2016 WL 2731497, at *4 (W.D. Ky. May 6, 2016) (request for defendant to sign and authorize a document); *Smith v. Sindu Trucking, LLC*, 3:21-CV-00544-BJB-RSE, 2022 WL 20834450, at *3 (W.D. Ky. Aug. 3, 2022) (request for accident report where defendant did not "did not prepare an accident report or investigate the accident" prior to litigation); *Caldwell Tanks, Inc. v. Alelco, Inc.*, 3:19-CV-00927-BJB-RSE, 2022 WL 15722614, at *4 (W.D. Ky. Aug. 12, 2022) (request for job cost report).

*Waskul*'s warning that "an attorney may not simply rely on custodian self-collection of ESI" is underscored by the facts of this case. *Id.* Counsel for Stites & Harbison states that "[w]e provided the Court's order to Rare Character and explained the documents ordered by the Court to be produced" and then "asked for everything Rare Character and Fortuna Bourbon had that was responsive." [ DE 65-1 at 1179]. Counsel "did not ask Rare Character whether the company had an accounting database or what types of records could be generated from that database." [*Id.*] In response, Nevenglosky "told [counsel for Rare Character] there were certain documents that were used" and "[t]hose documents were produced out of QuickBooks," apparently without counsel's knowledge of the source. [DE 65 at 1175]. Illustrating why this investigation was insufficient, it took only one question from Plaintiffs' counsel about Fortuna Bourbon's records before Nevenglosky disclosed Defendants' use of QuickBooks. [*See* DE 50-1 at 1028, 19:5–9 ("Q. As far as Fortuna Bourbon being set up when it was set up, where were the books established or who established the books? A. The books are in QuickBooks, if that's the question.")]. And when counsel presented Nevenglosky with the requests for production and asked, "whether there is a general ledger for Fortuna Bourbon," Nevenglosky answered "I don't believe it was requested, nor was the QuickBooks requested." [*Id.* at 1028, 20:3–8].

Simply put, Defendants' failure to produce accounting records in QuickBooks other than those generated in Defendants' "regular course of business" was not "justified" because it lacked a "reasonable basis in fact and law." [DE 65 at 1169 (citing *Pierce*, 487 U.S. at 566 n.2)]. The law is clear that documents contained within databases such as QuickBooks are subject to discovery. The record in this case shows that Stites & Harbison failed to reasonably investigate whether Rare Character was in possession of responsive accounting records and as a result of that failure,

16

Defendants did not comply with the January 2025 Order. An award of reasonable expenses under Rule 37 is therefore mandatory. Fed. R. Civ. P. 37(b)(2)(C).

Although the Court affirms Magistrate Judge Lindsay's finding that Defendants' noncompliance was unreasonable, the Court does not find that Stites & Harbison's conduct acted in bad faith. There is no evidence that they intentionally withheld responsive documents. Instead, the documents were never collected in the first place. When the existence of the records was revealed, Stites & Harbison did make efforts to remedy the issue by offering to produce reports from QuickBooks at Plaintiffs' request. [DE 65 at 1160]. The Court is satisfied that this is not a case of malfeasance.

### C. Whether Plaintiffs were prejudiced

Stites & Harbison next contend that Magistrate Judge Lindsay erred in considering the prejudice to Plaintiffs. Specifically, they argue that there is no evidence that Defendants' delay prejudiced Plaintiffs' ability to raise a defense and that "[w]hat little prejudice Plaintiffs suffered from the delay in production of the QuickBooks records could have been avoided if Plaintiffs' counsel would have specified what reports he wanted generated." [DE 65 at 1171 – 1173]. But, as explained in the Magistrate's finding, "Defendants should have produced the requested information no later than February 7, 2025." [DE 64 at 1145]. Regardless of how soon the Plaintiffs could have acquired QuickBooks records by working with Defendants following the Nevenglosky deposition, Plaintiffs were unquestionably prejudiced because that deposition had already taken place.

### D. Whether monetary sanctions were appropriate

Although Stites & Harbison was not expressly warned that failure to comply with the January 2025 Order would result in sanctions, they knew or should have known that Rule 37

17

requires courts to "order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust." Fed. R. Civ. P. 37. As discussed above, Stites & Harbison did not provide a "reasonable basis in both fact and law for failing to initially produce the QuickBooks reports." [DE 65 at 1174]. Nor does the Court find that "other circumstances make an award of expenses unjust." Fed. R. Civ. P. 37(b)(2)(A). Accordingly, an award of expenses is not only appropriate, it is required.

### E. Whether sanctioning Stites & Harbison alone was warranted

Finally, Stites & Harbison objects to the Magistrate's decision to impose sanctions solely against them:

> The Recommendation, which devotes only one paragraph to this finding, states: "During the May 7, 2025, Telephonic Status Conference, counsel for Defendants took complete responsibility for Defendants' misconduct. Magistrate Judge Lindsay thus concluded, "[i]n the absence of anything in the record to suggest otherwise, the undersigned recommends that responsibility be assigned where responsibility was volunteered" and recommended sanctions be levied against Stites & Harbison "alone." Stites & Harbison respectfully submits that this finding was in error because the record does not reflect that counsel even acknowledged "misconduct" on the Defendants' part, much less "took complete responsibility for it."

[DE 65 at 1174]. The Court need not consider whether it was reasonable to ascribe responsibility for the mistake based on "Stites & Harbison's refusal to cast blame on its client for alleged misconduct during the May 7, 2025 telephonic conference." [*Id.* at 1176]. It is enough that the Objections and the Counsel Affidavit reflect that Stites & Harbison failed to reasonably investigate whether Rare Character maintained "any . . . accounting records . . . or general and/or subsidiary ledgers." [DE 42 at 978. *See also* DE 65-1 ("[W]e did not ask Rare Character whether the company had an accounting database or what types of records could be generated from that database")].

18

Based on the record presented, the Court affirms Magistrate Judge Lindsay's finding that it was Stites & Harbison's conduct which warranted the sanction. *See Johnson v. Cleveland Heights/Univ. Heights Sch. Dist. Bd. of Educ.*, 66 F.3d 326, 1995 WL 527365, at *3 (6th Cir. Sept. 6, 1995).

## IV.   CONCLUSION

For the reasons explained, and the Court being otherwise sufficiently advised, Stites & Harbison's Objections [DE 65] are **OVERRULED** and Magistrate Judge Lindsay's Report and Recommendation [DE 64] is **ACCEPTED**. Accordingly, it is **ORDERED** that:

1. The Motion to Strike the Answer to Complaint, Counterclaim, and for Attorney Fees and Costs [DE 50] filed by Plaintiffs is **GRANTED IN PART AND DENIED IN PART**. Plaintiffs shall be awarded attorney fees and costs; however, the Court will not strike the Defendants' pleadings.

2. Counsel for Defendants shall compensate Plaintiffs for their reasonable expenses incurred, including attorneys' fees and costs, for the filing of the Motion to Strike [DE 50], for their participation in the May 7, 2025, Telephonic Status Conference [DE 55], and for their March 27, 2025, correspondence with Defendants' counsel [DN 55-2].

Rebecca Grady Jennings, District Judge
United States District Court

December 1, 2025

cc: counsel of record